GERBER AND ASSOCIATES, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gerber & Associates, Inc. v. Commissioner
Docket Nos. 18564-81; 18565-81; 22482-81.
United States Tax Court
T.C. Memo 1987-446; 1987 Tax Ct. Memo LEXIS 443; 54 T.C.M. (CCH) 420; T.C.M. (RIA) 87446; September 2, 1987. *443 Held: (1) For 1973 through 1976, Ps understated their taxable income and underpaid their taxes in the amounts determined by the Commissioner by means of the source and application of funds method of reconstruction of income; (2) For 1977, Ps are not entitled to claim a short-term capital loss with respect to certain shares of stock; (3) For 1977 and 1978, the Commissioner's determinations concerning deductions and a credit claimed for certain alleged business expenses are upheld; (4) For 1977, Ps, as partners, must include in income their share of funds received by the partnership but not distributed to Ps; (5) For 1973 through 1976, P is liable for the addition to tax for fraud under sec. 6653(b), I.R.C. 1954; and (6) For 1977 and 1978, Ps are liable for the addition to tax for negligence under sec. 6653(a), I.R.C. 1954. Belan Kirk Wagner, for the petitioners. Reid M. Huey, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Petitioner
Year
Deficiency
Section 6653(a) I.R.C. 1954 [2] *444 Section 6651(a)(1) I.R.C. 1954
Section 6653(b) I.R.C. 1954
Glen T. and Patricia Gerber
1973
$ 127,704.71
$ 63,852.36
1974
105,902.03
52,951.02
1975
24,068.96
12,034.48
Glen T. Gerber
1976
116,375.40
58,187.70
Gerber and Associates
1976
26,401.68
$ 1,540.04
$ 6,600.42
Glen T. and Patricia Gerber
1977
27,269.33
1,363.47
1978
40,173.23
2,008.66
After concessions by the parties, the issues for decision are: (1) Whether, for 1973 through 1976, the petitioners understated their taxable income, and consequently underpaid their taxes, in the amounts determined by the Commissioner by means of the source and application of funds method of reconstruction of income; (2) whether, for 1977, the petitioners are entitled to claim a short-term capital loss with respect to certain shares of stock; (3) whether, for 1977 and 1978, the petitioners are entitled to deduct or credit certain amounts for expenses allegedly incurred for business purposes; (4) whether, for 1977, the petitioners, as partners, must include in income their share of funds received by the partnership but not distributed to the petitioners; (5) whether, for 1973 through 1976, the petitioner Glen T. Gerber is liable for the addition to tax for fraud under section 6653(b); and (6) whether, for 1977 and 1978, the petitioners are liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the *445 facts have been stipulated, and those facts are so found. The petitioners, Glen T. and Patricia Gerber, husband and wife, maintained their residence in Huntington, Indiana (Huntington), on the dates their petitions were filed in this case. The petitioner, Gerber and Associates, Inc. (Associates), had its principal place of business in Huntington at the time it filed its petition in this case. Mr. and Mrs. Gerber filed their joint Federal income tax returns for 1973, 1974, 1975, 1977, and 1978 with the Internal Revenue Service Center at Memphis, Tennessee. They filed an amended return for 1978 with the Internal Revenue Service at Richmond, Virginia. Associates filed its Federal corporate income tax return for 1976 with the Internal Revenue Service Center at Memphis, Tennessee. Mr. Gerber will sometimes be referred to as the petitioner. The petitioner is a high school graduate who never had any formal post-high school education. From 1954 through 1964 and from 1966 through 1969, he was employed by the Kroger Company, a grocery chain. The petitioner was a 49-percent owner of a Dodge automobile dealership in Huntington from 1964 through 1966. From 1969 through 1973, he was employed *446 by the Financial Management Institute (later named Management Guidance, Incorporated). Following that employment, the petitioner engaged in the business of providing accounting services, including computerized billing services, and financial services, including maintaining accounts receivable, for doctors under the name of Physicians and Dentists Management Services. In the early 1970s, he began work with Associates. During 1973 and 1974, the petitioner operated a sole proprietorship named Gerber and Associates, which was not related to Associates. Such sole proprietorship offered services to professional clients for computerized billing, debt collection, and coordination of information among professional advisors. In the course of performing his duties for Financial Management Institute, Management Guidance, Incorporated, and Physicians and Dentists Management Services, and for a "short period of time" after his association with these ventures, the petitioner made appearances at banks on behalf of clients concerning the preparation of their financial statements and in the course of their securing loans. In addition, he negotiated on behalf of his clients with the IRS concerning *447 unpaid taxes. Finally, for a fee, he assisted taxpayers in the preparation of their tax returns. The petitioner testified that, in 1978, he was a contract administrator of ten health spas. He stated that such spas were located in Toronto, Canada; Cleveland, Ohio; Toledo, Ohio; Indianapolis, Indiana; Miami, Florida; St. Louis, Missouri; Dallas, Texas; Houston, Texas; Austin, Texas; and San Francisco, California. On April 5, 1972, the articles of incorporation for Associates was filed with the Secretary of State of Indiana. Associates' existence was to be perpetual. As stated in such articles, the purposes of Associates were: Section 1. To carry on business in the United States as a corporation engaging in buying, leasing, taking options on, and acquiring by conveyance real estate for private or commercial development, developing same for private or commercial use; and selling, leasing or otherwise marketing same. Section 2. To transact any and all lawful business for which corporations may be formed under the Indiana General Corporation Act, as amended.
Associates acted as the developer for hotels in Peru, Indiana, and in Huntington (the hotels). Such hotels were leased by L *448 and K Enterprises (L and K), a division of a publicly traded corporation. During the period 1972 through 1976, the petitioner was the sole shareholder of Associates. During such period, the petitioner was the president, Larry Wells was the vice president, and Richard Green was the secretary of Associates. During such period, Associates maintained a checking account with the American Fletcher National Bank in Indianapolis, Indiana (AFNB), with the petitioner and possibly Mr. Wells as the only signatories. The petitioner provided the preparer of Associates' tax returns with the information used in the preparation of such returns for each year 1972 through 1976. The petitioner, in his capacity as president, signed each such return for Associates. On the returns for 1973, 1974, 1975, and 1976, Associates claimed depreciation for certain property owned by it. Associates never claimed an interest in, nor a depreciation deduction for, any automobile or boat. On October 30, 1973, Associates entered into a loan agreement with American Fletcher Mortgage Company, Inc. , for the principal amount of $ 700,000.00. The loan was obtained for the primary purpose of constructing the hotel in *449 Huntington, and the disbursing agent for the loan was the Huntington Abstract Company. Such amount was disbursed as follows: $ 673,691.96 for construction, $ 306.25 for prepaid interest, $ 9.49 for certain taxes, and $ 25,992.30 as excess proceeds. The excess proceeds were sent to Associates by a check made payable to the petitioner. He used these funds to purchase a $ 25,000.00 certificate of deposit in his name. In addition, in 1973, the petitioner received three other checks from the Huntington Abstract Company, totalling $ 6,509.05. The petitioner controlled the disbursements of the loan proceeds. Mr. Wells was not aware that the petitioner used such proceeds to purchase certificates of deposit in the petitioner's name. In November 1973, the petitioner purchased a $ 10,000 certificate of deposit in his name at the Indiana Bank and Trust Company in Fort Wayne, Indiana (IBT Co.). He purchased such certificate of deposit with proceeds from rent checks from L and K which were payable to Associates. The interest payable on such certificate of deposit was paid to the petitioner and was not reported by Associates on any tax return. G and W Enterprises, Inc. (G and W), was formed *450 allegedly for the purpose of acting as a general contractor on behalf of Associates with respect to the building of the hotels. In fact, it existed for only 6 or 7 months in 1973 and 1974. The "G" stood for Gerber, and the "W" stood for Wells. It was never capitalized, and the petitioner never saw any articles of incorporation or bylaws for G and W. The petitioner maintained a checking account in the name of G and W. Disbursements from such account were $ 76,849.57 in 1973 and $ 109,936.45 in 1974. G and W did not prepare financial statements or file Federal income tax returns during the years at issue. Financial information concerning G and W was allegedly reflected on the tax returns of Associates for 1973 and 1974. The petitioner, Mr. Wells, and their spouses, entered into an oral partnership agreement to purchase real estate. The partnership was known as the Gerber and Wells Partnership (the partnership). For 1974 and 1976, the partnership filed income tax returns. A return was prepared for 1975, although there is no evidence that it was filed. All such returns were prepared by an accountant. The petitioner was responsible for maintaining the books and records necessary *451 for such returns and signed the returns that were filed. On its returns, the partnership reported losses of $ 4,492.28 in 1974, $ 2,947.51 in 1975, and $ 8,534.50 in 1976. During the period December 1972 to January 1974, the petitioner maintained a checking account in his name, entitled "house account," at the Anthony Wayne Bank in Fort Wayne, Indiana (AWB). From December 1972 through September 1975, the petitioner maintained another checking account in his name, without a title, at AWB. During the period December 1972 through January 1977, the petitioner maintained a checking account in his name, entitled "special account," at the Fort Wayne National Bank in Fort Wayne, Indiana (FWNB). On February 17, 1976, the petitioner opened a checking account in his name at IBT Co. Such account was open through the end of 1976. During 1975 and 1976, Mrs. Gerber maintained a checking account at the Community State Bank in Huntington. It was the petitioner's responsibility to make sure that there were sufficient funds in this account for Mrs. Gerber to write checks. On January 1, 1973, the petitioner had checking account balances in the total amount of approximately $ 4,686.09, and the *452 petitioners had approximately $ 37,255.00 in loans outstanding. At the end of the year, the petitioner had checking account balances which totalled approximately $ 3,794.74. In 1973, the petitioners obtained new loans for $ 88,500.00, renewals for $ 43,250.00, and repaid principal and interest on loans of $ 42,024.64. In addition, an unaudited financial statement of the petitioners, prepared by Donald H. Borger & Co., showed that as of December 31, 1973, the petitioners had assets of $ 55,893.63, liabilities of $ 235,396.35, and a net worth of $ 320,497.28. In June 1973, the petitioner opened a stock brokerage account in his name. During 1973, the petitioner purchased stock worth approximately $ 41,246.08 through such account. The petitioner obtained the money necessary to make such purchases from the surplus which Associates had secured from certain loans. The petitioner failed to report $ 318.00 in stock dividends on his 1973 return. In 1973, the petitioner purchased a 1972 Chevrolet for $ 3,000, a 1973 Alco trailer for $ 3,500, a 1973 Discoverer motor home for $ 10,000, and a 1971 Jaguar for $ 4,000. On May 14, 1973, the petitioner purchased a 21-foot-long 1972 Silverline *453 boat. The boat was purchased in exchange for $ 2,000 and a car. The $ 2,000 was paid by a check drawn on Associates' account at AFNB. The car was owned by the petitioner. The boat was used by the petitioner and his family, Mr. Wells, and certain attorneys. The boat was stored in a barn at the petitioner's farm. In October 1973, the petitioner purchased a 1974 Lincoln Continental Mark IV, serial no. 4Y89A809464, for $ 8,846.58. In November 1973, a 1974 Lincoln Continental Mark IV, serial no. 4Y89A835828, was purchased in the name of Associates for $ 11,485.30. The petitioner signed the order form without indicating a business title. Due to a trade-in allowance of $ 1,857.60, the cash price of the car that was purchased in November was $ 9,627.70. Such Lincoln was titled to G and W. The petitioner paid for both cars with checks drawn on his account at AWB and listed both as assets on his financial statement. During 1973, the petitioner used shares of stock purchased through his stock brokerage account, the two 1974 Lincoln Mark IVs, and the Silverline boat as security for personal bank loans. In 1974, the petitioner used both 1974 Lincoln Mark IVs, the certificates of deposit, *454 the 1971 Jaguar, the 1973 Discoverer motor home, and 1,400 shares of stock as security for personal bank loans. During 1973, the petitioners purchased real estate in Huntington at 651 William Street for $ 8,000, at 321-323 Market Street for $ 12,000, [3] and at 24 West Park Drive for $ 20,000. In August 1973, the petitioners entered into a contract to purchase a lot at 44 West Maple Street in Huntington for $ 3,400. Title to such lot was transferred to the petitioners on January 14, 1974. On September 21, 1973, the petitioners sold 1.721 acres of land in Huntington for $ 18,000. In addition, prior to 1973, the petitioners sold approximately 60 acres of land. The purchaser made payments to the Markle State Bank on behalf of the petitioners of $ 3,000.00 in 1973 and $ 14,861.88 in 1974. Such payments were not reported on their returns for 1973 or 1974. On November 8, 1973, the petitioners entered into a contract for the sale of the real estate located at 24 West Park *455 Drive for $ 25,000.00. The sale price was to consist of $ 500.00 down, $ 1,500.00 on January 15, 1974, and the balance of $ 23,000.00 on November 15, 1974. In addition, the buyers executed two interest-bearing promissory notes with a total principal value of $ 7,600.00 payable to the petitioner. Five thousand dollars of such principal was to repay a loan from the petitioners which was subsequently satisfied by the transfer of a truck worth $ 5,000.00. On November 15, 1974, the petitioners entered into a second contract for the sale of the same real estate to the same buyers. Such contract provided credit for payments previously received and required rent in addition to purchase payments. On August 2, 1975, the buyers made the final payment of $ 21,500.00 for the West Park Drive property. Of this payment, $ 14,310.55 was used to pay First Federal Savings and Loan of Huntington, and $ 7,189.45 went directly to the petitioners. In addition, as a result of a court action by the petitioners against the buyers, the buyers paid the petitioners $ 1,200.00 in 1975. The balances in the petitioner's checking accounts totalled approximately $ 3,795.00 at the beginning of 1974 and approximately *456 $ 284.00 at the end of such year. During 1974, the petitioner obtained new loans of $ 177,824.50 and loan renewals of $ 152,000.00. During the year, he made principal and interest payments on all loans of $ 158,983.74. During 1974, the petitioner purchased a 1975 Lincoln for $ 11,924.00, a 1970 Plymouth for $ 2,500.00, and J. W. Campbell stock for $ 11,500.00. During 1974, the petitioner sold stock with a $ 23,761.57 cost basis for $ 15,448.25. In addition, he exchanged certain stock for 40 shares of United Aircraft stock. At the beginning of 1975, the total of the balances in the petitioner's checking accounts was approximately $ 284.00, and such total was approximately $ 470.00 at the end of the year. During 1975, the petitioner obtained new loans of at least $ 51,242.40 and renewals of $ 65,995.90. During the year, he made principal and interest payments on all loans of approximately $ 95,608.11. In 1975, the petitioners made improvements to their residence costing approximately $ 5,800, of which $ 5,000 was financed by a home improvement loan from the First Federal Savings and Loan Association of Huntington. In January 1975, the petitioners sold the real estate located *457 at 44 West Maple Street for $ 4,000. In April 1975, the petitioners sold the property located at 651 William Street for $ 10,650. On March 24, 1975, the petitioners sold a parcel of approximately 3 acres of land in Huntington for $ 15,000. On July 16, 1975, they sold the property located at 321-323 Market Street for $ 22,500. On November 12, 1975, the petitioners sold a parcel of property containing .8 acres to Mr. Wells for $ 3,783. On May 13, 1975, the petitioners purchased property located at 576 William Street for $ 14,500. In order to purchase such property, the petitioners executed a mortgage to the First Federal Savings and Loan Association of Huntington as security for an $ 11,600 loan. On November 10, 1975, Associates entered into an investment agreement with Komputer Dynamics Corporation (KDC), K. Richard Payne, Charles M. Russell, Ronald E. Young, and R. Chad Zulich. Under such agreement, Associates agreed to make $ 155,000 available to KDC in return for interest payments on $ 50,000, 25 percent of the voting stock of KDC, and a percentage of gross profits of KDC for 2 years following execution of the agreement. In 1976, KDC sued the petitioner for breach of the *458 investment agreement. In anticipation of an adverse judgment, the petitioner transferred title of real estate located in Columbia City, Indiana, from Associates to himself without any payment for such transfer. The petitioner sold such real estate to Mr. Wells for $ 50,000, reported the transaction on his return as a $ 25,000 gain, and claims to have paid $ 22,500 to KDC in 1977 as a settlement of the suit. In 1975, the petitioner purchased a 1973 Capri, which was financed by a loan from IBT Co. On April 7, 1975, the petitioner purchased a Corvette for $ 2,650 with a check from the special account. He subsequently sold the car to Mr. Wells. On May 13, 1975, the petitioner and Charles A. Dees purchased a 1973 Jaguar and a 1975 Jaguar for a total price of $ 14,900. The automobiles were paid for by a $ 2,000 telegraphic money order from Mr. Dees and the petitioner, and by a $ 12,900 cashier's check payable to and endorsed by Mr. Dees, and drawn on the Kondallville Bank & Trust Co. of Kondallville, Indiana. On September 3, 1975, the petitioner purchased KDC stock worth $ 1,000 with a check from the special account. On November 21, 1975, the petitioner purchased a 1976 Cadillac for *459 $ 2,482 in cash and a trade-in allowance of $ 9,486 for the 1975 Lincoln. The total of the petitioner's checking account balances was approximately $ 472.00 at the beginning of 1976 and approximately $ 919.00 at the end of 1976. During 1976, the petitioner obtained new loans of $ 50,600.00 and renewals of $ 84,495.64. In addition, during such year, he made principal and interest payments on all loans of $ 41,001.49. On January 11, 1976, the petitioner submitted a financial statement to AWB which listed assets of $ 489,456.00, liabilities of $ 125,675.00, and a total net worth, as of January 1, 1976, of $ 363,781.00. On November 30, 1976, the petitioner purchased a 1977 Lincoln Continental for $ 10,000. He obtained a loan for $ 10,000 from IBT Co. in order to make such purchase. On December 11, 1976, the petitioner purchased a 1977 Vogue motor home. The price of such motor home was $ 40,500. The petitioner also purchased certain tires and received an allowance of $ 18,800, leaving a balance of $ 22,732, which was paid by two checks dated December 11, 1976. In 1976, the petitioner sold his 1976 Cadillac to a physician who agreed to make the remaining payments on the car. On *460 October 28, 1976, the petitioner and Mr. Hougendobler purchases a 1976 Corvette for $ 8,844. The petitioner obtained a loan from the FWNB in the amount of $ 7,600 in connection with the purchase of the Corvette. He sold the Corvette for $ 9,000 in 1976 and paid Mr. Hougendobler for his share of the car. During 1976, the partnership purchased property in Huntington adjacent to the hotel. A portion of such property was sold to Mr. Forney for $ 125,000. The purchase price was paid by an earnest money deposit of $ 10,000, cash of $ 65,000, and two promissory notes of $ 25,000 each with interest at a rate of 10 percent. As of the date of the trial, the property had been paid for in full. At the beginning of 1977, the petitioner had approximately $ 466 in his checking accounts. At the end of 1977, he had no funds in the accounts. On November 3, 1977, the petitioner entered into a 24-month lease agreement for a 1978 Lincoln Mark V. Under such lease, he was to pay $ 321.10 a month. In January 1977, the petitioner received a $ 4,220.56 bill for legal fees for services performed with respect to three matters: "Caley," "Flint Creek Realty," and KDC. On their Federal income tax returns, *461 the petitioners reported adjusted gross income (loss) of ($ 237.59) in 1973, $ 16,457.23 in 1974, $ 8,745.72 in 1975, $ 27,096.96 for 1977, and $ 81,780.00 for 1978. The petitioners reported taxable income (loss) of ($ 12,477.01) for 1973, $ 2,368.55 for 1974, ($ 4,922.29) for 1975, $ 22,848.31 for 1977, and $ 78,654.00 for 1978. The petitioners filed no return for 1976. The partnership reported ordinary losses on its returns of $ 4,492.28 for 1974, $ 2,947.51 for 1975, and $ 8,534.50 for 1976. In his notices of deficiency, the Commissioner computed the petitioners' unreported income for 1973 through 1975, and the petitioner's unreported income for 1976, by use of the source and application of funds method for reconstructing income. He determined that the petitioners received unreported income in the amounts of $ 297,786.80 for 1973, $ 195,842.17 for 1974, and $ 66,654.12 for 1975, and that the petitioner received $ 187,531.00 for 1976. After concessions, the Commissioner recomputed the petitioners' unreported income as follows: Sources
1973
1974
1975
1976
Wages
- 0 -
$ 15,000.00
- 0 -
- 0 -
Dividends - stock
- 0 -
141.00
- 0 -
- 0 -
Interest income
$ 1,330.00
- 0 -
$ 1,373.56
- 0 -
Schedule C income
3,850.00
2,229.00
3,975.00
- 0 -
Sale of assets
19,400.00
43,761.57
47,744.00
- 0 -
Rental & other income
7,969.41
8,477.55
6,950.01
- 0 -
Supplemental income
- 0 -
- 0 -
5,400.00
- 0 -
Depreciation - Sched. E
2,275.00
2,716.00
2,716.00
- 0 -
Bank accounts decrease
- 0 -
3,026.82
- 0 -
- 0 -
New loans
88,500.00
177,824.00
51,242.06
$ 67,927.50
Peru Trust Co.
2,650.08
- 0 -
- 0 -
- 0 -
Cash on hand decrease
3,550.00
100.00
- 0 -
- 0 -
Huntington Abstract Co.
37,001.36
- 0 -
- 0 -
- 0 -
Insurance proceeds
9,350.00
- 0 -
- 0 -
- 0 -
Total Sources
$ 175,875.85
$ 253,275.94
$ 114,000.63 [4] *462 $ 67,927.50
Applications
1973
1974
1975
1976
Assets acquired
$ 121,625.00
$ 14,424.00
$ 43,332.00
$ 53,990.00
Loan repayments
42,024.64
158,983.74
95,608.11
80,327.66
Bank account increase
3,201.42
- 0 -
2,300.00
803.14
Stock purchased
44,313.18
3,067.10
- 0 -
- 0 -
J.W. Campbell stock
- 0 -
11,500.00
- 0 -
- 0 -
G & W Enterprises
76,849.57
109,936.45
- 0 -
- 0 -
Partnership expense
- 0 -
4,255.62
12,808.13
3,322.42
Associates
- 0 -
47,480.92
9,850.08
1,676.30
Personal living expense
17,187.63
17,200.32
24,291.23
17,117.52
Itemized deductions (less interest)
374.02
186.37
108.00
- 0 -
Other assets purchased
27,056.18
6,965.58
3,175.00
3,255.00
Purchase/payments real estate - other
11,465.08
1,500.00
7,338.50
Loan/real estates payments - other
20,754.81
51,043.13
18,280.87
8,573.30
Auto expenses by check
1,475.37
1,863.78
2,374.23
1,306.41
Travel and entertainment by check
1,238.72
3,356.99
2,830.91
3,564.83
Other business expenses by check
32,906.06
3,039.31
6,109.27
1,120.00
Cash withheld - expenses paid
6,584.79
7,103.53
1,526.36
5,620.47
Rental
- 0 -
- 0 -
(300.00)
- 0 -
Transfer of funds
- 0 -
- 0 -
- 0 -
5,055.38
Total funds applied
$ 408,696.36 [5]
$ 441,688.82 [6]
$ 226,658.69 [7]
$ 185,732.46 Excess of funds applied over sources
232,820.51
188,412.88
112,658.06
117,804.96
Less G & W Enterprises adjustment
76,849.57
109,936.45
- 0 -
- 0 -
Less Statutory adjustment
54,835.30
60,343.53
86,540.40
46,481.23
Corrected taxable income
101,135.91
18,132.90
26,117.66
71,323.73
Taxable income (loss) per return
(12,477.01)
2,368.55
(4,922.29)
- 0 -
Adjustment to income
$ 113,612.92
$ 15,764.35
$ 31,039.95
$ 71,323.73
In his notice of deficiency, the Commissioner also determined deficiencies for 1977 and 1978 resulting from the disallowance of a capital loss claimed by the petitioners and deductions and credits for certain alleged business expenses. The petitioners' claims and the Commissioner's determinations with respect to such claims will be described subsequently in the Opinion. The Commissioner determined that the underpayments of tax for 1973 through 1976 were due to fraud on the part of the petitioner and that the underpayments of tax for 1977 and 1978 were due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). In a notice of deficiency issued to Associates, the Commissioner determined a deficiency for 1976 and additions to tax under sections 6651(a)(1) and 6653(a), but he has now conceded that deficiency and the additions to tax. *463 OPINION The first matter for discussion is the Commissioner's contention that the petitioners improperly raised new issues after the trial in this case. In their brief in answer, the petitioners raise four new issues: (1) Whether the statute of limitations on assessment and collection of tax had expired with respect to the years 1973, 1974, and 19975; (2) whether Associates had sufficient current and accumulated earnings and profits to support dividend treatment for the years 1973, 1974, 1975, and 1976; (3) whether the petitioners are entitled to deduct $ 22,500 for 1977 as an ordinary and necessary business expense attributable to KDC; and (4) whether the petitioners are entitled to a deduction for legal and professional fees in the amount of $ 2,500 for 1977 and $ 7,500 for 1978 in connection with KDC. The petitioners did not raise such issues prior to filing their brief in answer. The Commissioner claims that such issues were raised too late to be considered by the Court. In general, every issue that the taxpayer intends to litigate must be clearly set forth in his petition. Rule 35(b)(4), Tax Court Rules of Practice and Procedure; [8]Central National Bank v. Commissioner,29 B.T.A. 530, 538 (1933). *464 The petition may be amended once as a matter of course before the answer is served. Rule 41(a). After the answer is served, an amendment may be made only by leave of Court or by written consent of the Commissioner. Rule 41(a). In addition, when an issue not raised in the petition is tried by the express or implied consent of the parties, the Court upon motion may allow such amendment to the petition as is necessary to cause it to conform to the evidence and to raise such issue. Rule 41(b)(1). The petitioners did not raise the four issues in question in their petition, and they did not avail themselves of the Court's procedures for the amendment of pleadings to raise such issues. In addition, such issues were not tried by the express or implied consent of the parties. Although the petitioners were not represented by counsel when they filed their petitions or when the trial took place, they were represented by counsel for almost 2 years during the time between filing and trial; thus, for a substantial time prior to trial, they were represented by attorneys familiar with the Rules… It may be that such *465 attorneys deliberately did not raise such issues. However, in any event, it is certain that the issues were raised too late; at trial, the parties presented little or no evidence concerning such issues. As a result, the parties did not produce a record upon which such issues can be decided. See Pierce v. Commissioner,30 B.T.A. 469 (1934). The first issue for decision is whether the petitioners understated their taxable income for each of the years 1973, 1974, and 1975, and the petitioner for 1976, in the amounts determined by the source and application of funds method of reconstruction of income. The Commissioner may determine the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The use of the source and application of funds method has long been an acceptable method of determining income. See, e.g., Cohen v. Commissioner,9 T.C. 1156, 1162-1163 (1947), affd. 176 F.2d 394 (10th Cir. 1949). *466 The source and application of funds method is based upon the assumption that the amount by which the taxpayer's application of his funds exceeds his known sources of income is taxable income, absent some showing by the taxpayer of a nontaxable source. See, e.g., Taglianetti v. United States,398 F.2d 558, 562-563 (1st Cir. 1968), affd. per curiam 394 U.S. 316 (1969). A presumption of correctness attaches to the Commissioner's determination, and a petitioner bears the burden of overcoming such presumption and proving that the determination is erroneous. Rule 142(a); Cracchiola v. Commissioner,643 F.2d 1383, 1385 (9th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court. Generally, errors in the Commissioner's reconstruction of income computations do not shift the burden of going forward with the evidence to the Commissioner. See Anderson v. Commissioner,250 F.2d 242, 246 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. The petitioners argue that the Commissioner's computations contain so many errors that the presumption of correctness which attaches to the notice of deficiency is dispelled and the burden of proof rests with the Commissioner. In general, *467 the petitioners contend that the petitioner was a financial conduit for Associates, the partnership, and G and W. In particular, they claim that the Commissioner failed to properly account for over $ 100,000 in loans obtained and disbursed by the petitioner. The petitioners' argument is without merit. The Commissioner's computations contain a detailed analysis of thousands of checks, loan agreements, bank statements, contracts, and other similar documents. The large number of sources of information has made the Commissioner's task difficult. However, the Commissioner's computations are extremely well documented; the values used by the Commissioner in his computations are referenced to documents in evidence. In contrast, where the petitioners disagree with the substance of the Commissioner's computations, their argument rests upon the self-serving testimony of the petitioner. We simply found the petitioner's testimony not to be credible. In addition, certain explanations found in the petitioners' brief appear to be based upon information not found in the record. Therefore, the petitioners have failed to show that the Commissioner was arbitrary in making his determination, and *468 they have failed to meet their burden of proof with respect to this issue. However, because of the thousands of items involved in the Commissioner's computations, there are, as may be expected, errors in addition, errors due to transposing of figures, or errors due to multiple entries of figures. Errors of this nature, that have been identified as such by the petitioners in their brief, should be corrected by the Commissioner in his computations for entry of decisions. Concerning the petitioners' contention that the Commissioner failed to account for over $ 100,000 in loans, we are not persuaded that such loans existed. The petitioners contend that the Commissioner failed to account for a $ 100,000 loan to the petitioner in 1973 from AFNB on behalf of the City of Huntington. In addition, the petitioners contend that the petitioner made an interest-free loan of $ 50,000 to the City of Huntington during the same period. The petitioner contends that he paid $ 80,000 in 1973 and $ 20,000 in 1974 to AFNB in satisfaction of its loan. In support of his contention, he produced several documents. Such documents indicate that there were contracts between the petitioner and the City of *469 Huntington, but they do not set forth the terms of any such contracts. In the absence of written contracts or loan agreements for purported loans of this size, we conclude that the petitioners have failed to prove the existence of such claimed loans. Therefore, we sustain the Commissioner's computation of deficiencies for 1973, 1974, 1974, and 1976, subject to the correction of those mathematical errors identified by the petitioners in their brief in answer. The next issue is whether, for 1977, the petitioners are entitled to claim on their Federal income tax return for that year a short-term capital loss in the amount of $ 22,500 for their KDC stock. The Commissioner determined that the petitioners were not entitled to such deduction because they had failed to establish their basis in the stock or that such stock became worthless during 1977.
Section 165(a) allows a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. To be allowable as a deduction under section 165(a), a loss must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs. *470 Section 165(g)(1) provides that if any security which is a capital asset becomes worthless during a taxable year, the loss resulting therefrom shall be treated as a loss from the sale or exchange of a capital asset on the last day of the taxable year. Section 165(g)(2) defines security to include a share of stock in a corporation. The determination of when stock becomes worthless is a question of fact based on all of the relevant facts and circumstances. Boehm v. Commisioner,326 U.S. 287, 292-293 (1945). The petitioners have not presented credible evidence that the stock of KDC became worthless in 1977. In fact, the petitioners entered into evidence a letter dated February 18, 1978, wherein Mr. Payne resigned as president and chairman of the board of KDC. In addition, in the last month of 1977, the petitioner claims to have paid KDC $ 22,500 to settle the lawsuit brought by KDC against the petitioner. Therefore, the petitioners have failed to meet their burden of proving that they actually sustained a loss on the KDC stock in 1977. The next issue for decision is whether the petitioners are entitled to deduct or credit certain amounts for expenses allegedly incurred for business *471 purposes in 1977 and 1978. Section 262 expressly denies a deduction for all "personal, living, or family expenses." On the other hand, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." Whether expenditures are for ordinary and necessary business expenses is a question of fact ( Commissioner v. Heininger,320 U.S. 467 (1943)), and the petitioner has the burden of demonstrating that the purpose of the expenditure was primarily business rather than personal and that the business in which the taxpayer is engaged benefited, or was intended to be benefited, by the expenditure ( Chapman v. Commissioner,48 T.C. 358 (1967); Bennett's Travel Bureau, Inc. v. Commissioner,29 T.C. 350 (1957)). The petitioners claimed a deduction for legal fees in the amount of $ 300.00 on their 1978 return. In support of such deduction, they submitted a bill for $ 4,220.56 from the law firm of Strutz, Phillips & Miller, dated January 18, 1977. The bill was addressed to the petitioner, care of Associates, and itemized services performed with respect to three matters: "Caley," "Flint Creek Realty," and KDC. The Caley *472 matter involved a lawsuit against Associates, the petitioner, Consolidated Foods, and Liberty National Life Insurance Company. The petitioner did not provide any evidence concerning the Flint Creek Realty case. The KDC matter involved a suit brought against the petitioner, Charles A. Dees, Jr., Lee Charles Dees, Larry P. Wells, Richard A. Green, all in their individual and corporate capacities; Associates; and Dees and Associates. The petitioners did not produce credible evidence showing that these services were rendered on their behalf, rather than for Associates or some other party. They produced no credible evidence that they, rather than Associates, paid for such services. Finally, the petitioners claim that they paid $ 7,500.00 to the law firm in 1978, but they provided no explanation for allocating $ 300.00 to their return. Therefore, the petitioners have failed to meet their burden of proving that they are entitled to deduct any amount as legal expenses. On their return for 1978, the petitioners claimed a business deduction for rent in the amount of $ 4,600. They presented no evidence concerning such claimed deduction. Thus, the petitioners failed to prove that they *473 are entitled to such deduction. The next claimed business expenses to be examined are those for travel, gasoline, and lodging. The deductibility of travel expenses is limited by the substantiation requirements of section 274(d), which provides in part: (d) Substantiation Required. -- No deduction shall be allowed -- (1) under section 162 * * * for any traveling expense (including meals and lodging while away from home), * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel * * * (C) the business purpose of the expense or other item * * * Section 1.274-5(b)(2), Income Tax Regs., requires that, for travel expenses, the dates of departure and return, the destinations, and the business purpose of the travel must be substantiated. Under such regulation, the amount of each separate expenditure must be substantiated, except that incidental expenditures may be aggregated. In order to substantiate expenses, the taxpayer must produce adequate records or proper corroborative evidence of the expenditure. To furnish adequate records, the taxpayer *474 must produce an account book, diary, or similar record and, in addition in the case of certain expenses, documentary evidence "such as receipts, paid bills, or similar evidence." Sec. 1.274-5(c)(2), Income Tax Regs. To be proper substantiation, records must be made contemporaneously with the expense. Sec. 1.274-5(c)(2)(ii), Income Tax Regs.In the absence of adequate records, a taxpayer may alternatively substantiate his expenditures: (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is the description of a gift or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is * * * the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence. [Sec. 1.274-5(c)(3), Income Tax Regs.] The petitioners claimed an *475 expense of $ 1,218.75 for gasoline on their return for 1977 and expenses of $ 3,100.00 for airline travel and $ 800.00 for lodging on their return for 1978. In support of such claims, the petitioners provided cancelled checks, dated in 1978, totalling over $ 11,000.00. Such checks were drawn on the special account and were payable to various airlines. The petitioner also provided numerous passenger copies of tickets. Ticket destinations included New York, New York; Atlanta, Georgia; Miami, Florida; Dallas-Fort Worth, Texas; Amarillo, Texas; Honolulu, Hawaii; San Francisco, California; New Orleans, Louisiana; Minneapolis, Minnesota; Houston, Texas; St. Louis, Missouri; Newark, New Jersey; and Providence, Rhode Island. In addition, the petitioner provided the Court with several receipts for hotels in San Francisco. However, the petitioners provided no specific information or documentary evidence concerning the business purpose of the expenditures evidenced by such checks, tickets, and receipts. The petitioner did testify as to the purposes of some of the trips, but his testimony was not specific and not convincing. Therefore, the petitioners have failed to substantiate the claimed *476 travel expenses in the manner required by section 274(d) and section 1.274-5 of the regulations. The next business items are those related to ownership of the Vogue motor home. The petitioners deducted depreciation expense of $ 4,386.25 for 1977 and $ 4,686.00 for 1978 and claimed an investment tax credit of $ 1,905.00 for 1977. The petitioners bear the burden of proving that the Commissioner's determinations in the notice of deficiency disallowing such deductions and credit are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Specifically, the petitioners must show that the deductions and credit claimed by them satisfy the requirements of the appropriate statutory provisions. See Deputy v. duPont,308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Section 48(a) limits the availability of the investment tax credit under section 38 to "property with respect to which depreciation * * * is allowable and having a useful life * * * of 3 years or more. [9] Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade *477 or business or of property held by a taxpayer for the production of income. The regulations provide that the amount deducted each taxable year should be pursuant to a reasonably consistent plan so that the aggregate of the amounts deducted, plus the salvage value, will equal the cost or basis of the depreciated property at the end of its estimated useful life. Sec. 1.167(a)-1, Income Tax Regs.
The petitioner testified that during 1977 and 1978 he drove the motor home 15,000 miles in connection with his health spa activities. He stated that 75 percent of his use of the motor home was ordinary and necessary business use, including business trips to Atlanta, Georgia; Jacksonville, Florida; Houston, Texas; Los Angeles, California; and San Francisco, California. The petitioners have provided no documentary evidence, contemporary records, or non-party testimony to support their claims, and the petitioner's general testimony was not convincing. Therefore, they have failed to meet their burden of proof. The next business item concerns depreciation *478 expense for the Gould Manor Building, Live Oak Building, and furniture at the Live Oak Building. The petitioners claimed depreciation expense for such buildings and such furniture of $ 3,466.67 for 1977 and $ 10,825.00 for 1978. They based such claims upon useful lives of 15 years for the Gould Manor Building, 10 years for the Live Oak Building, and 3 years for the furniture. The Commissioner determined that the proper depreciation amounts were $ 1,733.33 for 1977, and $ 4,405.55 for 1978. He based his determination o useful lives of 30 years for the buildings and 10 years for the furniture. The petitioners presented no evidence to rebut the Commissioner's determination and, therefore, have failed to meet their burden of proof. The next issue for determination is whether the petitioners were required to include in income $ 5,000 received by them from the sale of the Forney property. The partnership sold a portion of the property owned by it in Huntington to Mr. Forney for $ 125,000. The purchase price was paid by a $ 10,000 earnest money deposit, $ 65,000 in cash, and two promissory notes of $ 25,000 each with interest at the rate of 10 percent. As of the date of trial, the *479 purchase price had been paid in full. The Commissioner claims that $ 5,000 of the amount paid by Mr. Forney was interest income to the petitioners in 1977. The petitioners contend that they never received the $ 5,000 and that they have sued Mr. Wells in an attempt to recover their share of the payment from Mr. Forney to the partnership. Under section 61(a), gross income includes amounts received as interest. In addition, under such section, gross income includes the taxpayer's distributive share of partnership gross income. Section 702 provides that, generally, each partner shall take into account separately his distributive share of the partnership's various items of income. Such items are includable in income by the partner whether or not such items are distributed. Sec. 1.702-1(a), Income Tax Regs.; see also Starr v. Commissioner,267 F.2d 148, 149 (7th Cir. 1959), affg. on this issue a Memorandum Opinion of this Court; Beck Chemical Equipment Co. v. Commissioner,27 T.C. 840, 853-856 (1957). The petitioners argue that Mr. Forney did not pay the partnership the full amount of the purchase price. In the alternative, the petitioners argue that they are not required to pay tax *480 on partnership income which has not been distributed to them. Finally, the petitioners contend that the $ 5,000 is deductible under section 165(a) as a loss sustained during the year and not compensated for by insurance or otherwise. The evidence is uncontradicted that Mr. Forney paid the full amount of the purchase price to the partnership. The fact that the proceeds from the land sale have not been distributed to the petitioners does not relieve them of their tax liability. Finally, the petitioners have not provided any evidence that they suffered a loss within the meaning of section 165. Compare Wingarten v. Commissioner,38 T.C. 75, 78-83 (1962), with Rizzo V. Commissioner,T.C. Memo. 1961-265. Consequently, we sustain the Commissioner's determination on this issue. The next issue for decision is whether the petitioner is liable for the addition to tax for fraud under section 6653(b) for 1973, 1974, 1975, and 1976. Such section provides that if any part of any underpayment of tax required to be shown on a return was due to fraud, there shall be added to such tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving fraud by clear and *481 convincing evidence. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651 (3d Cir 1974); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). To establish fraud, the Commissioner must show that the petitioner intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence since direct proof of the petitioner's intent is rarely available. His entire course of conduct can often be relied on to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 1971); Otsuki v. Commissioner,53 T.C. at 105-106. *482 When a claim of ignorance or honest mistake is set forth, this Court must consider the petitioner's intelligence, education, and tax expertise in making its determination. Drobny v. Commissioner,86 T.C. 1326, 1348-1351 (1986); Iley v. Commissioner,19 T.C. 631, 635 (1952). The petitioner contends that there were no underpayments for the years 1974 and 1975. He concedes that he negligently failed to maintain adequate books and records, but he maintains that he separated personal expenditures from corporate andpartnership expenditures and that he did not use corporate funds for personal expenditures. In support of such claims, he states that he invested certain business proceeds in certificates of deposit and stocks, all of which were in his name, in the hope of raising additional funds to pay for cost overruns in the hotel construction projects. In addition, he argues that because of his lack of education and lack of familiarity with accounting, his attempts to segregate his personal assets from business assets failed. The evidence convincingly establishes that the petitioner fraudulently underpaid his taxes during each of the years 1973, 1974, 1975, and 1976. He furnished the *483 information used for the petitioners' joint returns, and each of those returns understated taxable income by a substantial amount in 1973, 1974, and 1975. He failed to file a return for 1976, although he had a significant amount of taxable income. Such a consistent pattern of underreporting substantial amounts of income, over a period of several years, is, standing alone, highly persuasive evidence of fraud. Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,239 F.2d 187, 191 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd, without published opinion 621 F.2d 439 (5th Cir. 1980). The petitioner is a financially astute entrepreneur who is familiar with the Federal income tax system. Since the late 1960s he was involved in providing management, accounting, and billing services to professional clients. He represented certain clients before banks and the IRS. He was a businessman who took an active role in several businesses. In 1972, Associates was *484 incorporated by the petitioner for the purpose of owning, developing, leasing, and selling real estate in Indiana. During the period 1972 through 1976, the petitioner was the sole shareholder and the president of Associates. He controlled the disbursements of the loan proceeds for the construction projects of Associates, and he signed its tax returns. During 1974 through 1976, the petitioner was responsible for maintaining the books and records necessary for the accountant to prepare the tax returns of the partnership. His financial expertise and his recognition of the need to segregate funds are demonstrated by the facts that he maintained three checking accounts: the house account, the special account, and his individual account; and that he maintained separate accounts for Associates and for G and W. The record reveals that, in 1973, the petitioner diverted a substantial amount of money from Associates to himself; yet, he failed to report any of the diverted funds as income on the petitioners' return. He used part of the excess loan proceeds from the Huntington Abstract Company to purchase a $ 25,000.00 certificate of deposit in his name. In addition, he received three checks, *485 worth a total of $ 6,509.05, from the Huntington Abstract Company. He purchased a $ 10,000.00 certificate of deposit in his name with proceeds from rent checks payable to Associates from L and K. In addition, the petitioner made approximately $ 41,246.08 worth of purchases of stock in his private account with money from the surplus that Associates had on certain loans. Finally, none of the income produced by these funds was reported on the tax returns of Associates or by the petitioners. In 1973, the petitioner purchased a boat. He paid for the boat with a Chevrolet automobile, owned by the petitioners, and a $ 2,000 check from Associates. The boat was treated as the petitioners' personal property; it was used extensively by the petitioners' family; it was stored in a barn at the petitioners' farm; it was used as collateral for a personal loan for the petitioner; and it was not reported as an asset by Associates. The petitioners failed to report certain payments made to them or on their behalf. Prior to 1973, the petitioners sold approximately 60 acres of land. The purchaser of such land made payments to the Markle State Bank on behalf of the petitioners of $ 3,000.00 in 1973 *486 and $ 14,861.88 in 1974. In 1973, the petitioners had unreported stock dividends of $ 318.00. During 1973 through 1976, the petitioner consistently acquired valuable personal property. He spent over $ 40,000.00 on stock, over $ 50,000.00 for real estate, and over $ 90,000.00 for automobiles. At the same time, he reported taxable income (loss) of ($ 12,477.01) for 1973, $ 2,368.55 for 1974, and ($ 4,922.29) for 1975, and he filed no return for 1976. Finally, the petitioners held themselves out as having acquired wealth during the period 1973 through 1976. An unaudited financial statement prepared by Donald H. Borger & Co. showed that as of December 31, 1973, the petitioners had assets of $ 555,893.63, liabilities of $ 235,396.35, and a net worth of $ 320,497.28. On January 11, 1976, the petitioners submitted a financial statement to AWB which listed assets of $ 489,456.00, liabilities of $ 125,675.00, and a total net worth of $ 363,781.00. On this record, we hold that the Commissioner has met his burden of proof on this issue. The final issue for decision is whether the petitioners are liable for the addition to tax under section 6653(a) for 1977 and 1978. Such section provides *487 for an addition to tax if any part of an underpayment of tax was due to negligence or intentional disregard of rules and regulations. See Richardson v. Commissioner,72 T.C. 818 (1979). The petitioners bear the burden of proving that they are not liable for such addition to tax. Rule 142(a); Luman v. Commissioner,79 T.C. 846, 860-861 (1982). The petitioners contend that the petitioner made every reasonable effort to ensure that their 1977 and 1978 tax liabilities were properly reported. Specifically, they state that the petitioner maintained extensive records on numerous intricate transactions and that he retained a CPA to provide accounting services and tax advice. The petitioners' contention is contrary to the evidence; the petitioner lacked the documentation necessary to support many of the deductions claimed by him in 1977 and 1978. Particularly shocking is the petitioner's lack of any documentation concerning the business purpose of the Vogue motor home or the airline travel. Clearly, the petitioner was negligent with respect to maintaining his records. Thus, we sustain the addition to tax under section 6653(a) for 1977 and 1978. Decisions will be entered under Rule 155. *488 Footnotes
1. Cases of the following petitioners are consolidated herewith: Glen T. Gerber and Patricia Gerber, docket Nos. 18565-81 and 22482-81. ↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.
3. We observe that the parties refer to "321-323 Market Street" in stipulation number 33 and that the same property is referred to as "321-323 E. Market" in Ex. 221-HM. We adopt the address stipulated by the parties. ↩
4. This column adds up to $ 119,400.63. This affects the adjustment to income. 5. This column adds up to $ 408,056.47. This affects the adjustment of income. ↩
6. This column adds up to $ 441.906.84. This affects the adjustment to income. ↩
7. This column adds up to $ 229,632.69. This affects the adjustment to income. ↩
8. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure. ↩
9. The regular investment tax credit has been generally repealed for property placed in service after Dec. 31, 1985. Sec. 49(a), I.R.C. 1986↩.