T.C. Memo. 2001-311


UNITED STATES TAX COURT


WAYNE AND PAMELA BERRY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6522-95.                    Filed December 13, 2001.


<u>Ketia Berry Wick</u> and <u>Rando Berry Wick</u>, for petitioners.

<u>Robert S. Scarbrough</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

WOLFE, <u>Special Trial Judge</u>:  In so-called affected items notices of deficiency, respondent determined additions to tax with respect to petitioners' Federal income taxes for the years and in the amounts as shown below:

|  | Additions to Tax | | | |
| Year | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $398 | -- | -- | $2,388 |
| 1982 | -- | $1,660 | [1] | 7,366 |
| 1984 | -- | 363 | [1] | 1,852 |

[1]50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence.  Respondent determined underpayments attributable to negligence of $33,192 and $6,392 for 1982 and 1984, respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the remaining issue for decision is whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1979, and section 6653(a)(1) and (2) for 1982 and 1984, respectively.  We hold that petitioners are so liable.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  The stipulated facts and the attached exhibits are

---

[1]Petitioners concede that for each of the years in issue they are liable for additions to tax under sec. 6659 for underpayments of tax attributable to valuation overstatements in the amounts determined by respondent.  Also, petitioners have abandoned their argument that assessment and collection of the additions to tax for the years in issue are barred by the statute of limitations because petitioners allegedly received no notice of the entry of decision from their tax matters partner.  See Davenport Recycling Associates v. Commissioner, 220 F.3d 1255 (11th Cir. 2000), affg. T.C. Memo. 1998-347.

incorporated herein by this reference. Petitioners resided in Lake Stevens, Washington, at the time the petition was filed.

A.  The Whitman Transactions

These cases are part of the Plastics Recycling group of cases. The additions to tax arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to a partnership known as Whitman Recycling Associates (Whitman).

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The parties have stipulated that the underlying transactions involving the Sentinel recycling machines (recyclers) in this case are substantially identical to the transactions in Provizer v. Commissioner, supra.

Whitman, a limited partnership, was organized on September 22, 1982. It purported to lease four recyclers manufactured by Packaging Industries (PI) of Hyannis, Massachusetts. On its 1982 Federal income tax return, Whitman reported that each recycler had a basis of $1,750,000, and the partnership reported a net ordinary loss of $713,975.90. The losses and credits reported by Whitman were passed through to petitioners and the other limited partners.

B. Petitioners' Background

In 1965, after graduating from high school in Lake Stevens, Washington, Wayne Berry (petitioner) went to work at a sawmill. After working at the sawmill for 5 months, he was drafted into the U.S. Army. The Army sent him to a military school in Georgia for training to work with helicopters. Then he served in Vietnam for 3 years as a door gunner on a medivac helicopter. In 1968, he returned to Lake Stevens and married Pamela Berry, whom he had met in high school. With the assistance of his father, in Lake Stevens he started a business that manufactured various interior house products such as moldings, door jambs, window trim, and base shoe. Petitioner's father had owned and sold a similar business in California. In 1973, petitioner purchased his father's interest, taking full control of the business. Petitioner operated it as Apex Wood Products Corp. (Apex). At the time of trial, petitioner owned 98 percent of the stock of Apex.

During the years at issue, Pamela Berry was a flight attendant for United Airlines. She was married to petitioner until 1992, when their divorce was finalized.

Petitioners were financially successful. During 2 of the 3 years in issue,[2] they received total income (excluding claimed

---

[2]Petitioners' 1979 Federal income tax return was not part of the record.

losses from a condominium in Hawaii and from Whitman and another
partnership) as follows:

| 1982 | 1984 |
|------|------|
| $146,879 | $187,674 |

Petitioners' investment portfolio included a variety of
interests, including several tax-oriented investments.
Petitioners maintained a brokerage account with Merrill Lynch.
They invested in a company called Shaman, a clothing import
company that distributed merchandise through stores in the
Seattle metropolitan area.  They conducted a Schedule C business
involving lithographic prints.[3]  In addition to petitioners'
investments specifically listed in the record, Kirk Clothier
(Clothier), petitioners' accountant, testified that he had joined
together with them in "several" investments.  Petitioner alluded
to investments prior to Whitman when he testified that in

---

[3]Petitioners reported their lithographic print business on a
Schedule C, Profit or Loss From Business or Profession (Schedule
C).  On the Schedule C, petitioners indicated:  The name of their
business was "WAYNE D. BERRY ARTS", the main business activity
was "ART WORKS", and the product was "LITHOGRAPHIC PRINTS".  At
trial, petitioner briefly summarized the business as an
arrangement in which he "purchased the rights to the marketing
profits generated from the sale of the * * * [lithographic
prints]."  On each of the two tax returns of petitioners in the
record, 1982 and 1984, petitioners reported zero gross income
from the business.
     Although the record is incomplete regarding petitioners'
lithographic print business, we note that lithographic prints are
a familiar tax-sheltering device.  See, e.g., Rose v.
Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir.
1989); Bronson v. Commissioner, T.C. Memo. 1993-233; Gangel v.
Commissioner, T.C. Memo. 1991-358; Ballard v. Commissioner, T.C.
Memo. 1988-436.

deciding to invest in Whitman he "felt confident of * * * [Clothier's] ability and expertise" because in "all of the * * * [investments] that I've been involved with Kirk [Clothier], he has invested in the same ones". Petitioner also explained that the Whitman Recycling transaction "was the second involvement I had with Kirk Clothier."

Petitioner was introduced to the Whitman investment by Clothier. Clothier explained to petitioner that investing in Whitman could serve three purposes: To make money, to shelter taxes, and to help the environment. Petitioners paid $25,000 for a 2.75-percent limited partnership interest in Whitman. Petitioners did not personally review Whitman's offering memorandum or investigate Whitman before becoming participants in the partnership. Nor did petitioners have any education or work experience in the plastics materials or the plastics recycling industry.

As a result of their payment of $25,000 for their interest in Whitman, petitioners claimed on their 1982 Federal income tax return a net operating loss deduction of $19,635. They also claimed investment credits totaling $38,763, which was limited to their 1982 income tax liability (as reduced by the partnership loss) of $24,815. Of the $13,948 balance of the unused credits, $8,007 was carried back to 1979, generating a tax refund claim of

$7,960,[4] which was petitioners' total tax liability for 1979.
The remaining balance of the unused credits, $5,942, was carried
forward to 1983.  On their 1984 Federal income tax return,
petitioners claimed a net operating loss deduction of $492 as a
result of their investment in Whitman.

C.  Kirk Clothier

Clothier is a certified public accountant (C.P.A.), and
holds a master's degree in taxation.  His accounting firm is
located in Seattle, Washington.  He has practiced accounting
since 1971.  Clothier was introduced to petitioner by
petitioner's brother, who played volleyball with Clothier in
college.  In 1973 or 1974, Clothier began assisting petitioners
with their personal income tax returns as well as the corporate
income tax returns and financial statements of Apex.  Petitioner
and Apex continued to employ the services of Clothier until 1997,
when petitioner switched to a local accountant for the purpose of
convenience.  In petitioner's words:  "every year it became more
difficult to get down * * * [to Seattle]" from Lake Stevens,
which is located 45 miles north of Seattle.

Clothier's services to petitioners were not limited to the
preparation of their income tax returns.  As Apex became more

---

[4]The discrepancy between the amount carried back to 1979,
$8,007, and the amount of the refund, $7,960, is due to the fact
that the carryback caused petitioners to lose a child care credit
of $47 for 1979.

profitable, petitioners were left with increasing amounts of discretionary income.  Clothier began providing petitioners with investment advice, meeting with petitioner several times each year.

In 1981 or 1982, Clothier was introduced to the Whitman tax shelter by Ed Margolin (Margolin), a marketer of Whitman.  After speaking with Margolin, Clothier contacted an attorney connected with the tax shelter.  The identity of the attorney is unclear, but the parties have stipulated that the attorney was either the attorney for Samuel Winer (general partner and tax matters partner of Whitman) or the attorney who wrote the legal opinion contained in the offering memorandum for Whitman.  Clothier also asked one of his other clients, Lee Connel (Connel), an engineer, to discuss the equipment with Winer.  At trial, Clothier testified that he thought Margolin later told him:  "he had gone down and met with Mr. Winer personally and done some personal investigation of the investment."  At that point, Clothier proposed the investment to petitioner.  Prior to these conversations, Clothier had no knowledge of or experience in the plastics recycling industry.

At trial, Clothier had difficulty remembering how much information he had given petitioner before petitioner decided to invest in Whitman.  Clothier recalled telling petitioner that he had contacted the attorney who wrote the legal opinion, that the

attorney was from a reputable law firm, that one of his clients made some phone calls to investigate the equipment, and that he thought that Margolin had spoken with Winer.

OPINION

We have decided many Plastics Recycling cases. Most of these cases, like the present case, have presented issues regarding additions to tax for negligence. See, e.g., Thornsjo v. Commissioner, T.C. Memo. 2001-129; West v. Commissioner, T.C. Memo. 2000-389; Barber v. Commissioner, T.C. Memo. 2000-372; Barlow v. Commissioner, T.C. Memo. 2000-339; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein), affd. sub nom. Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000). In all but two of the Plastics Recycling cases, we found the taxpayers liable for the additions to tax for negligence. Moreover, in all of those cases we found the taxpayers liable for additions to tax for valuation overstatement.

In Provizer v. Commissioner, T.C. Memo. 1992-177, the test case for the Plastics Recycling group of cases, this Court: (1) Found that each recycler had a fair market value of not more than $50,000; (2) held that the transaction, which was virtually identical to the transaction in the present case, was a sham

because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the recyclers; and (5) held that the partnership losses and tax credits claimed with respect to the plastics recycling partnership at issue were attributable to tax-motivated transactions within the meaning of section 6621(c). We also found that other recyclers were commercially available during the year in issue. In reaching the conclusion that the transaction lacked a business purpose, this Court relied heavily upon the overvaluation of the recyclers. Id.

Neither petitioners nor respondent had a copy of the offering memorandum for Whitman available at the time of trial, nearly 20 years after petitioners' investment. In Barber v. Commissioner, supra, where the taxpayers, like petitioners, were limited partners in Whitman, we explained:

> In a 4-step series of simultaneous transactions
> closely resembling those described in the Provizer case
> and stipulated by the parties herein, Packaging
> Industries of Hyannis, Massachusetts (PI) manufactured

and sold[2] four Sentinel EPS[3] recyclers to ECI Corp. (ECI) for $1,520,000 each. ECI simultaneously resold the recyclers to F&G Corp. (F&G) for $1,750,000 each. F&G simultaneously leased the recyclers to Whitman. Finally, Whitman simultaneously entered in a joint venture with PI and Resin Recyclers Inc. (RRI) to "exploit" the recyclers and place them with end-users. Under this latter arrangement, PI was required to pay Whitman a monthly joint venture fee.

For convenience, we refer to the series of transactions between and among PI, ECI, F&G, Whitman, and RRI as the Whitman transactions.

The sales of the Sentinel EPS recyclers from PI to ECI were financed using 12-year nonrecourse notes. The sales of the recyclers from ECI to F&G were financed using 12-year "partial recourse" notes; however, the recourse portion of the notes was payable only after the first 80 percent of the notes, the nonrecourse portion, was paid. No negotiations for the price of the recyclers took place between, or among, PI, ECI and F&G.

At the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI entered into arrangements whereby PI would pay a monthly joint venture fee to Whitman, in the same amount that Whitman would pay as monthly rent to F&G, in the same amount that F&G would pay monthly on its note to ECI, in the same amount that ECI would pay monthly on its note to PI. Further, in connection with the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI entered into offset agreements providing that the foregoing payments were bookkeeping entries only and were never in fact paid. Also in connection with the closing of the Whitman partnership, PI, ECI, F&G, Whitman, and RRI also entered into cross-indemnification agreements. [Id.]

[2]Terms such as sale and lease, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes. Similarly, terms such as joint venture and agreement are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[3]EPS stands for expanded polystyrene. The case of Provizer v. Commissioner, T.C. Memo. 1992-177, * * * affd. per curiam without published opinion 996 F.2d

1216 (6th Cir. 1993), involved Sentinel expanded polyethylene (EPE) recyclers. However, the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See <u>Davenport Recycling Associates v. Commissioner</u>, T.C. Memo. 1998-347, * * * affd. 220 F.3d 1255, * * * (11th Cir. 2000); see also <u>Gottsegen v. Commissioner</u>, T.C. Memo. 1997-314 * * * (involving both the EPE and EPS recyclers); <u>Ulanoff v. Commissioner</u>, T.C. Memo. 1999-170 * * * (same).

A.  <u>The Private Offering Memorandum</u>

In <u>Barber v. Commissioner</u>, <u>supra</u>, significant portions of the Whitman offering memorandum were summarized as follows:

> By a private placement offering memorandum dated September 28, 1982 (the offering memorandum), subscriptions for 18 limited partnership units in Whitman were offered by the partnership's promoter to potential limited partners at $50,000 per partnership unit. Pursuant to the offering memorandum, the limited partners would own 99 percent of Whitman and the general partner, Sam Winer, would own the remaining 1 percent. Also pursuant to the offering memorandum, each limited partner was required to have a net worth (including residence and personal property) in excess of $1 million, or net income in excess of $200,000, for each investment unit.
>
> The offering memorandum stated that Winer would receive $62,000 for administrative and other services to be paid from the proceeds of the private placement offering as "management fees". The offering memorandum also stated that the partnership would pay "fees of purchaser representatives and selling commissions" from the proceeds of the offering in an amount equal to 10 percent of the aggregate price of the units. Thus, Winer would earn a 10-percent commission upon selling an interest in the partnership. In addition, the offering memorandum stated that Winer could "retain as additional compensation all amounts not paid as purchaser representative fees or sales commissions in connection with the Offering".
>
> The face of the offering memorandum warned, in bold capital letters, that "**THIS OFFERING INVOLVES A HIGH DEGREE OF RISK**". The offering memorandum also warned that "An investment in the partnership involves a high degree of business and tax risks and should,

therefore, be considered only by persons who have a substantial net worth and substantial present and anticipated income and who can afford to lose all of their cash investment and all or a portion of their anticipated tax benefits." The offering memorandum went on to enumerate significant business and tax risks associated with an investment in Whitman. Among those risks, the offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service, and the purchase price paid by F&G to ECI might be challenged as being in excess of the fair market value; (2) the partnership had no prior operating history; (3) the management of the partnership's business would be dependent on the services of the general partner, who had limited experience in marketing recycling or similar equipment; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (6) certain potential conflicts of interest existed.

The offering memorandum informed investors that the Whitman transactions would be executed simultaneously.

The offering memorandum prominently touted the anticipated tax benefits for the initial year of investment for an investor in the partnership. In this regard, the offering memorandum stated, in part, as follows:

The principal tax benefits expected from an investment in the Partnership are to be derived from the Limited Partner's share of investment and energy tax credits and tax deductions expected to be generated by the Partnership in 1982. The tax benefits on a per Unit basis are as follows:

|  | Payment | Projected Regular Investment and Energy Tax Credits | Projected Tax Deductions |
|---|---|---|---|
| 1982 | $50,000 | $77,000 | $38,940 |

The Limited Partners are not liable for any additional payment beyond their cash investment for their Units, nor are they subject to any further assessment. [Id.]

B.  Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioners were liable for additions to tax for negligence under section 6653(a)(1) and (2) with respect to underpayments attributable to petitioners' investment in Whitman.  Petitioners contend that they were not negligent because:  (1) They lacked investment experience and sophistication, and (2) they reasonably relied upon their C.P.A.

Section 6653(a) for 1979, and section 6653(a)(1) for 1982 and 1984, provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for 1982 and 1984 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947-948 (1985).  The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). The determination of negligence is highly factual.  When

considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment.  <u>Turner v. Commissioner</u>, T.C. Memo. 1995-363.

Respondent's determination of negligence is presumed correct, and petitioners bear the burden of proving that they were not negligent.  <u>Neely v. Commissioner</u>, <u>supra</u>.  See generally Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[5]

With respect to the large number of Plastics Recycling cases that have come before this Court, we have seen taxpayers from all walks of life and with greatly varying levels of education and investment experience.  In all such cases, there have been only two in which we held that the taxpayers were not negligent with respect to their participation in the Plastics Recycling Program, <u>Dyckman v. Commissioner</u>, T.C. Memo. 1999-79, and <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382.  Both cases involved unusual circumstances not present in the instant case, as discussed further below.

---

[5]Compare sec. 7491(c), which places the burden of production on respondent with respect to a taxpayer's liability for penalties and additions to tax.  Sec. 7491(c) is effective for court proceedings arising in connection with examinations commencing after July 22, 1998.  Petitioners do not contend, nor is there evidence, that their examination commenced after July 22, 1998, or that sec. 7491 is applicable in this case.  The notices of deficiency sent to petitioners with respect to the years in issue are dated Jan. 27, 1995.

1.  Petitioners' Investment Experience and Sophistication.

Petitioners argue that their lack of education and their lack of investment experience are factors supporting their claim that they were not negligent in investing in Whitman. Petitioners compare their backgrounds with those of the taxpayers in Dyckman v. Commissioner, supra, and Zidanich v. Commissioner, supra.

In Dyckman and Zidanich we held for the taxpayers on the issue of negligence based on special and unusual circumstances. One of the circumstances favoring taxpayers was their complete lack of sophistication in investment matters. In Dyckman v. Commissioner, supra, the taxpayers were a carpet salesman and an elementary school teacher. Their combined net worth was $50,000. Until the year in issue, their investment experience had been limited to bank accounts, a few certificates of deposit, and securities financed through withholdings from their paychecks for investment through employer plans. Id. In Zidanich v. Commissioner, supra, Mr. Zidanich was a steel worker and Mrs. Zidanich was a legal secretary. Prior to their investment at issue, their only investments were in stocks and bonds financed through withholding from Mr. Zidanich's paychecks and purchased through a company plan. Id.

Petitioner argues that his education level is similar to that of most of the taxpayers in the Dyckman and Zidanich cases,

in that petitioner had no formal education beyond high school. While a lack of any significant formal education beyond high school has been a factor in some cases where we have found that taxpayers were not negligent under section 6653, such cases are exceptions rather than the norm.  For examples of cases in which we have held the taxpayers negligent despite their modest formal education, see Singer v. Commissioner, T.C. Memo. 1997-325 (taxpayer, who worked with success in the floor covering business, quit high school during his sophomore year); Estate of Hogard v. Commissioner, T.C. Memo. 1997-174 (taxpayer, an owner of a business involving coin-operated entertainment machines, had a high school education), affd. without published opinion sub nom. Gilmore & Wilson Constr. Co. v. Commissioner, 166 F.3d 1221 (10th Cir. 1999); McPike v. Commissioner, T.C. Memo. 1996-46 (taxpayer, a firefighter, received no formal education beyond high school, except for a few courses in fire science); Lax v. Commissioner, T.C. Memo. 1994-329 (taxpayer, who spent his entire working career in the textile business, had no formal post-high school education), affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Klieger v. Commissioner, T.C. Memo. 1992-734 (several of the taxpayers had only high school educations); Gerber & Associates, Inc. v. Commissioner, T.C. Memo. 1987-446 (no formal post-high school education), affd. without published opinion 876 F.2d 106 (7th Cir. 1989).

The instant case is readily distinguishable from Dyckman v. Commissioner, supra, and Zidanich v. Commissioner, supra. At the time he invested in Whitman, petitioner was a relatively sophisticated investor, actively seeking out a variety of investments, including tax-oriented investments or speculations. Petitioner met personally with Clothier several times each year to discuss investment opportunities. Prior to their investment in Whitman in 1982, petitioners invested without the advice of their accountant in a condominium in Maui, Hawaii, and a lithographic print business, and maintained a brokerage account at Merrill Lynch. In addition, petitioner had made other investments with Clothier, including Shaman, a clothing import company that distributed merchandise through stores in the Seattle metropolitan area. Petitioners' investment experience significantly surpasses the experience of other taxpayers who we have found negligent under section 6653 for improperly sheltering income. See, e.g., McPike v. Commissioner, supra (taxpayers had no previous investment experience other than their personal residence).

We also view petitioner's career path as relevant in determining his level of business and financial sophistication. Petitioner is a true success story, in the tradition of American entrepreneurship. Petitioner cofounded a company in 1968. By 1982 he owned the company, and from operating the business he

earned a six-figure salary. Petitioners' income (exclusive of partnership losses) of $146,879 and $187,674 in 1982 and 1984, respectively, shows that petitioners stood to benefit substantially by the deductions and credits that Whitman offered. Clothier explained to petitioner the immediate tax benefits of the investment. The expectation of such benefits motivated petitioner to invest in Whitman.

At trial, petitioner made a transparent attempt to downplay his role in the success of Apex, describing his duties as "strictly limited to production". He described his business aptitude by saying: "I think everybody has strengths and weaknesses in what they do, and mine is, I'm more mechanically inclined." As to the source of Apex's success, petitioner said: "I've been lucky". Petitioner also testified that he has been diagnosed with dyslexia and that he does not enjoy reading.

Petitioner's claim that he lacks sophistication is self-serving and inconsistent with the facts. It is readily apparent that petitioner completely dominates the operations of Apex and is responsible for its remarkable success. His alleged choice to devote his efforts to the production operations of Apex as well as his aversion to reading are not inconsistent with his possessing business acumen. We note that petitioner acquired equipment in the name of Lake Stevens Leasing, which he described as a d/b/a for himself, that leased equipment to Apex.

Petitioner testified that his accountant told him there were tax advantages in this arrangement with respect to investment credits. The arrangement certainly is not unique, but it is tax-efficient and sophisticated. As petitioner himself admitted: "I do have a business sense of making a business operate" and "I know what it takes to get the product out the door to get income out of it." Petitioner's own testimony that he cofounded, built up, and now owns 98 percent of the highly successful Apex business is inconsistent with his argument that he lacks business capabilities.

In short, petitioner was not lacking in investment experience or sophistication. Petitioner's active role in seeking investments as well as founding, building, and operating a successful corporate enterprise and all the knowledge and experience associated with such a successful business career support the conclusion that he was capable of properly investigating and analyzing the Whitman tax shelter and that his failure to do so was negligent.

2. Petitioners' Reliance on Their C.P.A.

Petitioners claim that their reliance on Clothier's advice was reasonable. Under some circumstances a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849,

888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991).  However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  See Chakales v. Commissioner, 79 F.3d 726, 730 (8th Cir. 1996), affg. T.C. Memo. 1994-408; David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Freytag v. Commissioner, supra; Sann v. Commissioner, T.C. Memo. 1997-259.

Moreover, reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  See Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Sann v. Commissioner, supra.  Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of

the contemplated venture.  See <u>David v. Commissioner</u>, <u>supra</u>;
<u>Freytag v. Commissioner</u>, <u>supra</u>.

The purported value of the recyclers generated the deductions and credits.[6]  This circumstance was clearly reflected in the offering memorandum.  Although petitioner was given a copy of the offering memorandum, petitioner chose not to read it.  Instead, he exclusively relied on representations made by Clothier.  In his discussions with petitioner about Whitman, Clothier emphasized the tax benefits that petitioner would enjoy if he made the investment.  The offering memorandum prominently announced that an investment of $50,000 in Whitman would produce approximately $77,000 in immediate investment and energy tax credits.  Petitioners' investment of $25,000 produced for them tax credits totaling $38,763.  Like the taxpayers in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the deal."  Under these circumstances, a reasonably prudent person would have asked a qualified adviser if such a windfall were not too good to be true.  See <u>McCrary v. Commissioner</u>, 92 T.C. 827, 850 (1989).

In support of their claim that their reliance on Clothier

---

[6]On its 1982 tax return, Whitman reported that each of the four recyclers had a basis of $1,750,000.  In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), the test cases for the Plastics Recycling group of cases, this Court found that each recycler had a fair market value of not more than $50,000.

was reasonable, petitioners emphasized that Clothier had invested with them in the investments that Clothier had proposed prior to Whitman. However, petitioners did not claim, nor is there evidence, that Clothier invested in Whitman. Apparently, Clothier's decision not to invest in Whitman did not dissuade petitioners.

Like petitioners, Clothier had no knowledge of the plastics recycling industry. Moreover, Clothier did not consult with any persons who had expertise in plastics recycling. Instead, Clothier's sources of information about Whitman were limited to the offering memorandum and the representations of insiders. The only persons with whom Clothier remembers discussing Whitman were: (1) Margolin, a Whitman sales representative; (2) Connel, a client of Clothier; and (3) either Winer's attorney or one of the attorneys who wrote the tax opinion of Whitman. Each of these contacts either had a self-interest in the promotion of Whitman or had no knowledge about the plastics recycling industry.

Clothier's reliance on Margolin was unreasonable. Clothier remembers Margolin telling him that Whitman was a reasonable investment and that it had tax shelter advantages. These conclusory remarks, without further investigation, were not a proper basis for reliance, especially since there is no evidence that Margolin had any expertise with plastics recycling although

he was marketing the partnership interests. We have consistently held that advice from such persons is better classified as sales promotion. See Singer v. Commissioner, T.C. Memo. 1997-325; Vojticek v. Commissioner, T.C. Memo. 1995-444. We note that Margolin did not testify, and that circumstance suggests that if he had testified, his testimony would have been unfavorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The commission for selling units under the Whitman promotion was equal to 10 percent of the sales price. See Barber v. Commissioner, T.C. Memo. 2000-372. Clothier's reliance on his client, Lee Connel, was also unreasonable. Connel was an engineer by profession. He had no experience with plastics recycling. Clothier unreasonably assumed that Connel's engineering background would qualify him to make a reliable evaluation of the recyclers with minimal effort. Even if Connel were qualified, reliance on Connel would be unreasonable because there is no evidence that Connel ever saw the recyclers. Connel did not testify at trial, and our knowledge of his alleged investigation is based entirely on Clothier's vague recollection.

Under these circumstances, we are convinced that Clothier was not concerned with Whitman's economic or business aspects. Rather, Clothier understood that Whitman was a tax shelter. Clothier failed to consult an independent appraiser or anyone

with expertise in plastics recycling. If Clothier had made a reasonable effort to determine the fair market value of the recyclers, he would have determined that the recyclers' price was grossly inflated. At that point a reasonable person would have inquired why the partnership would be willing to "invest" in machines at far in excess of their fair market value when it could have purchased other much less expensive machines that performed virtually the same functions. It was not reasonable for petitioners to claim the substantial tax credits and partnership losses in issue on the basis of Clothier's advice.

Petitioners compare their relationship with Clothier to the relationships that the taxpayers had with their advisers in Dyckman v. Commissioner, T.C. Memo. 1999-79, and Zidanich v. Commissioner, T.C. Memo. 1995-382. Such comparisons are misplaced. In Dyckman v. Commissioner, supra, the taxpayers were close friends with their accountant, Mr. Kipness, as well as his family. Mrs. Dyckman tutored Mr. Kipness's daughter. When Mr. Kipness and his family moved from New Jersey to California, the Dyckmans continued to mail Mr. Kipness their tax information, and he continued to prepare their returns for some time after the move to California. Id. In Zidanich v. Commissioner, supra, Mrs. Zidanich worked for the adviser's father and subsequently for the adviser himself for 23 years. As to the other taxpayers in Zidanich, the Steinbergs, Mrs. Steinberg relied entirely on

her brother as her adviser and trustee of the funds that she and her brother had inherited from their parents. Mrs. Steinberg did not even know of the investment until the Internal Revenue Service contacted her. In view of her brother's highly successful career as an investor and investment manager, her entrustment of her funds to him was not unreasonable. Id.

Here, there is no evidence of a personal friendship between Clothier and petitioners outside of an accountant/client relationship. Clothier was a college acquaintance of petitioner's brother--not petitioner. Petitioners terminated their relationship with Clothier because a distance of 45 miles was too great an obstacle. The Dyckmans continued to use their accountant despite his permanent move with his family across the country. In sum, petitioners' relationship with Clothier was not the long-term relationship of friendship and trust with an adviser that was present in the Dyckman and Zidanich cases.

For the foregoing reasons, petitioners' reliance on Dyckman v. Commissioner, supra, and Zidanich v. Commissioner, supra, is misplaced.

In conclusion, we find that petitioners failed to exercise due care in claiming large deductions and tax credits with respect to Whitman on their Federal income tax returns. The disproportionately large tax benefits claimed on petitioners' Federal income tax returns, relative to the dollar amount

invested, should have alerted petitioners to the need for further investigation of the partnership transactions.  Their reliance on Clothier was misplaced because Clothier knew little about the business aspects of Whitman, and there is no reason for us to think he misled petitioners about the extent of his own knowledge in this respect.  Clothier relied on conclusory statements of insiders as well as the conclusion of his client, an engineer, who had no expertise in either taxes or the plastics recycling industry and made only a casual inquiry about the transaction. Neither Clothier nor petitioners undertook a good faith investigation of the fair market value of the recyclers or the underlying economic viability or financial structure of Whitman. Accordingly, we hold that petitioners are liable for the additions to tax for negligence under section 6653(a) for 1979 and section 6653(a)(1) and (2) for 1982 and 1984.

To reflect the foregoing,

Decision will be entered

under Rule 155.